UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                                          Case No. 21-CR-127

JAMISON L. KRAHENBUHL,

        Defendant.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW AND DECISION

---

Jamison L. Krahenbuhl, a retired Captain in the United States Airforce, faces two counts of disorderly conduct in violation of 38 C.F.R. §§ 1.218(a)(5) and (b)(11) for his March 24, 2021 conduct at the Veteran's Administration (VA) outpatient clinic in Green Bay, WI. Upon being served with notice of the violations, Krahenbuhl filed a motion to dismiss challenging the constitutional validity of the underlying regulations. Dkt. No. 4. The Court denied the motion. Dkt. No. 11. A one-day court trial was held on November 4, 2021.

What follows are the Court's Findings of Fact and Conclusions of Law. As noted above, Krahenbuhl was charged with two violations of 38 C.F.R. §§ 1.218(a)(5) and (b)(11), which read:

> (a) Authority and rules of conduct. Pursuant to 38 U.S.C. 901, the following rules and regulations apply at all property under the charge and control of VA (and not under the charge and control of the General Services Administration) and to all persons entering in or on such property. The head of the facility is charged with the responsibility for the enforcement of these rules and regulations and shall cause these rules and regulations to be posted in a conspicuous place on the property.
> …
> (5) Disturbances. Conduct on property which creates loud or unusual noise; which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; which otherwise impedes or disrupts the performance of official duties by Government employees; which prevents one from obtaining medical or other services provided on the property in a timely

manner; or the use of loud, abusive, or otherwise improper language; or unwarranted loitering, sleeping, or assembly is prohibited. In addition to measures designed to secure voluntary terminations of violations of this paragraph the head of the facility or designee may cause the issuance of orders for persons who are creating a disturbance to depart the property. Failure to leave the premises when so ordered constitutes a further disturbance within the meaning of this rule, and the offender is subject to arrest and removal from the premises.

…

(b) Schedule of offenses and penalties. Conduct in violation of the rules and regulations set forth in paragraph (a) of this section subjects an offender to arrest and removal from the premises. Whomever shall be found guilty of violating these rules and regulations while on any property under the charge and control of VA is subject to a fine as stated in the schedule set forth herein or, if appropriate, the payment of fixed sum in lieu of appearance (forfeiture of collateral) as may be provided for in rules of the United States District Court. Violations included in the schedule of offenses and penalties may also subject an offender to a term of imprisonment of not more than six months, as may be determined appropriate by a magistrate or judge of the United States District Court:

…

(11) Disorderly conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or prevent the normal operation of a service or operation of the facility, $250.

The Seconded Amended Information, filed November 2, 2021, charges Krahenbuhl with two counts of disorderly conduct. Count One alleges, in relevant part, that Krahenbuhl "engaged in conduct which created a loud and unusual noise, and used loud abusive or otherwise improper language." Count Two alleges Krahenbuhl "engaged in conduct which impeded and disrupted the performance of official duties by Government employees, specifically T.M. and J.M. and used loud abusive and otherwise improper language." Dkt. No. 26.

The violations are all to have occurred on March 24, 2021, at the VA Outpatient Clinic, a two-story building located in Green Bay, Wisconsin.

Considering the plain meaning of the regulation, *United States v. Melvin*, 948 F.3d 848, 851–52 (7th Cir. 2020), and in accordance with the Court's previous decision,[1] the Government was required to prove the following elements:

1. Defendant engaged in conduct that involved a loud or unusual noise, or included loud or abusive or otherwise improper language; and

2. Defendant engaged in said conduct on VA property; and

3. Defendant engaged in said conduct knowingly.

Count One stems from Krahenbuhl's interactions with the two VA police officers, while Count Two relates to Krahenbuhl's conduct during his respiratory therapy appointment.

To address the incidents in chronological order, the Court will begin with its findings as to Count Two.

The evidence established that Jamison L. Krahenbuhl had an appointment with Tiffany Mueller, a respiratory therapist at the Milo C. Huempfner VA Outpatient Clinic (hereinafter "Clinic") in Green Bay, Wisconsin on March 24, 2021. Dkt. No. 31 at 122. Upon arriving at the Clinic, Krahenbuhl went through the usual screening and safety checks before proceeding to the pulmonary area for his appointment with Mueller. *Id*. at 9. Michele Sikora, a Medical Support Assistant at the Clinic who does scheduling and check-in, testified that Krahenbuhl was "not very pleasant" when he registered for his appointment that day. *Id*. at 171. While checking in on March 24, 2021, Sikora testified that Krahenbuhl was upset that he could not also see an ophthalmologist that same day because it needed to be scheduled ahead. *Id*. Sikora also testified that Krahenbuhl began

---

[1] Dkt. No. 25.

3

Case 1:21-cr-00127-JRS   Filed 11/22/21   Page 3 of 10   Document 32

to pace around the waiting area in a way that made her nervous. *Id*. at 166. Having previously had a bad experience with a patient pacing in a similar way, Sikora then texted Lt. Andrew Turk of the VA Police Department, via a Microsoft Teams message, to come "patrol" the area, in case the situation took a turn for the worse.[2] *Id*.

Respiratory Therapist Tiffany Mueller retrieved Krahenbuhl from the waiting area for his appointment, which roughly coincided with Turk's arrival to check on the situation in the same waiting area. *Id*. at 76–77, 123. Turk testified that he did not hear or see anything out of the ordinary and returned to his office area on the first floor of the Clinic. *Id*. at 78. Meanwhile, Mueller and Krahenbuhl began the appointment. *Id*. at 124. Krahenbuhl would later testify, though the precise facts were not fully developed, that he had received a diagnosis of sleep apnea while in Germany and had also received continuous positive airway pressure (CPAP) equipment to treat the condition. *Id.* at 204–05.

Krahenbuhl brought the equipment with him to the appointment, and he and Mueller discussed it.[3] *Id.* at 126. Mueller then reviewed the sleep study Krahenbuhl provided and advised him that, under VA guidelines, he did not qualify to receive sleep apnea treatment or supplies. Instead Mueller offered that, if he desired, he could meet with a doctor to discuss the issue further. *Id*. at 126–127. Mueller testified it was at this point Krahenbuhl became agitated and loud. *Id.* at 127. He "slammed" his fists on the table and screamed at her "who the fuck are you." *Id.* at 126–28. Mueller characterized the episode

---

[2] Defense counsel introduced messages purporting to be sent by Sikora but their authentication was unclear. At any rate, the messages indicate the writer, allegedly Sikora, felt Krahenbuhl "just like[d] to argue with everything." *Id.* at 173, 177. Defense counsel intimated these messages indicate pervasive bias against Krahenbuhl by VA employees. *Id.* at 172. As will be discussed further, however, that does not give Krahenbuhl the right to be disorderly, nor does it create a defense against the charges in this case.

[3] Mueller testified the equipment showed no use. *Id.* at 126.

4

as "loud" and testified that Krahenbuhl continued to "yell" at her. Mueller then told Krahenbuhl the appointment is over. *Id.* at 127–28.

Julie Malchak, another respiratory therapist at the VA Clinic, was seated in an office near the treatment room occupied by Mueller and Krahenbuhl. *Id.* at 152. She testified that, although she could not precisely hear what was said, she could hear "yelling" and then a "loud" slamming noise. *Id.* at 156–57. Malchak testified fearing for Mueller's safety, she got up from her computer site and went across the hall and activated a silent panic alarm, which alerted VA Police to the disturbance. *Id.* at 156. The testimony indicated that almost simultaneously, Mueller informed Krahenbuhl that the appointment was over and he needed to leave. *Id.* at 128, 156. Despite that, Mueller testified, Krahenbuhl continued to "yell" at her. *Id.* at 128. Mueller then pushed herself back away from the table and left the room, escorting Krahenbuhl out of the pulmonary treatment area. *Id.* at 128–29.

Having reached the halfway point in the narrative and the end of the allegations in Count Two, it is appropriate to consider the evidence thus far.[4] During his testimony, Krahenbuhl admitted to yelling, slamming his hands down on the table, and to being loud at the appointment with the VA respiratory therapist. He offered only one caveat in his version of the events: "it wasn't really that bad." *Id*. at 213, 220. There is general agreement therefore that the conduct engaged in by the defendant satisfies the first two elements: it was loud, it was an unusual voice and it was at the VA. Giving the plain

---

[4] The Court pauses here to add one additional piece of evidence. Towards the end of the trial, during the defense case-in-chief, there was testimony by Michael Wallner, a patient advocate at the VA. Although not a fact witness to any of the events at issue, Wallner testified that he was contacted by Krahenbuhl about "a concern he thought he was going to have" at the VA. *Id.* at 186. Counsel never fully developed when this voicemail was created, but the witness's wording creates a strong implication that it took place sometime before March 24, 2021. *Id.*

5

meaning to the term 'loud', *Melvin*, 948 F.3d 848, it is clear both elements are proven. In this incident the evidence also shows it impeded and disrupted the performance of official duties of Government employees.

That leaves only the last element as to Count Two. According to the jury instructions of this circuit, a person acts knowingly "if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident." THE COMMITTEE ON FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, SEVENTH CIRCUIT PATTERN FEDERAL JURY INSTRUCTIONS CRIMINAL 4.10 (2012 ed.). Krahenbuhl testified that he was frustrated by Mueller's decision on his care and felt it was beyond her authority. He also testified, and his counsel argued, that he felt the only way to get results he wanted with the painfully slow VA process was to yell. That admission clearly indicates that his actions were knowingly made. Whatever his frustrations with the VA, well-founded or not, the testimony makes clear the simple fact that Krahenbuhl had alternatives to being disorderly. These were relayed to him by Mueller and are set out in Exhibit 101. Frustration with the process does not give Krahenbuhl the right to be disorderly.

Perhaps most telling, though, is the complaint Krahenbuhl made to Wallner. Wallner's testimony indicates that before he even met with Mueller, Krahenbuhl was agitated about the care he would be receiving. That suggests Krahenbuhl showed up to the VA on the day in question already angry, which plainly satisfies the 'knowing' standard required here.

Turning to Count One, Krahenbuhl's interactions with VA officers on March 24, 2021. Krahenbuhl left the pulmonary area on the second floor of the VA Clinic before the

6

police could arrive. Two officers were alerted by the panic alarm and attempted to locate the source of the disturbance. Dkt. No. 31 at 80. Both officers were in police uniforms. *Id.* at 81–82. Officer Daniel St. Amour proceeded on the ground floor, while Officer Andrew Turk went to the second floor via the stairs toward the respiratory therapy area. *Id.* at 17, 79. St. Amour located Krahenbuhl first, on the first floor near the Patient Advocate office and main entrance of the Clinic. *Id.* at 17–18. St. Amour described Krahenbuhl as walking "very intently" with a "thousand yard stare." *Id.* at 18. After radioing dispatch that he had located Krahenbuhl, St. Amour asked Krahenbuhl if they could talk, to which Krahenbuhl replied, "fuck off." *Id.* at 18–19. Krahenbuhl then walked past St. Amour to the Patient Advocate's office, but he was unable to speak to anyone immediately as no one was there.[5] *Id.* at 20. Krahenbuhl then went to leave the Clinic and while still in front of the Patient Advocate office on the first floor near the patient entrance, St. Amour asked to speak to him again and Krahenbuhl shouted to St. Amour to "fuck off" several times. *Id.* at 22.

Krahenbuhl then left the VA Clinic via the main patient entrance and proceeded via the walkway to the parking lot. He was followed by St. Amour, who continued to attempt to speak to him. *Id.* at 22–23. St. Amour characterized Krahenbuhl's attitude at this time as hostile and Krahenbuhl continued to tell him to "fuck off." *Id.* Lt. Turk arrived to join St. Amour, as Krahenbuhl and St. Amour were exiting the Clinic. *Id.* at 23. Both officers followed Krahenbuhl on the walkway to the parking lot, still attempting to speak with Krahenbuhl, and they were told again and again to "fuck off" and that "they were just

---

[5] Wallner testified that he spoke with Krahenbuhl in person at some point, but the specific date was never clarified. *Id.* at 186–87. Officer St. Amour testified that Krahenbuhl did not speak to a Patient Advocate in the course of their interaction on March 24, 2021. *Id.* at 20–21.

security guards." *Id.* at 23–24. As the three proceeded into the patient parking area, the officers attempted to get in front of Krahenbuhl to talk to him. *Id.* at 24–25. In the process, Turk grabbed Krahenbuhl's arm. *Id.* According to the officers, Krahenbuhl then assumed a "bladed" flighting stance with a closed fist.[6] *Id.* St. Amour then drew his pepper spray and pointed it at Krahenbuhl before lowering it when Krahenbuhl relaxed his stance at the order of the officers.[7] Dkt. No. 31 at 26.

Both officers told Krahenbuhl that they were veterans too, they just wanted to help, and Krahenbuhl had no right to speak to them that way. *Id.* at 27–28. St. Amour testified that at this point, Krahenbuhl told officers that the people at the VA were "fucking" with his disability rating and they had no right to do so. *Id.* at 28. Turk then made the decision that further pursuit of Krahenbuhl was not appropriate and Krahenbuhl reached his car. Krahenbuhl then departed the parking lot at a high rate of speed. *Id.* at 28, 212.

St. Amour subsequently investigated the incident and both officers prepared reports, though neither were offered into evidence. *Id.* at 28. St. Amour testified that he made the decision to issue the two citations at issue here and served them on Krahenbuhl at his next visit to the VA, on March 29, 2021. *Id.* at 30.

Krahenbuhl disputes the officers' accounts of the incident. He testified that he did not push past officers, did not tell them to "fuck off" multiple times, and denies that he knew police wanted to talk to him. *Id.* at 218. Krahenbuhl's account, however, is undercut by the testimony of Glenn Lawson, a bystander who witnessed the entire encounter from his transport van parked in the parking lot. *Id.* at 110. He stated that Krahenbuhl was

---

[6] Krahenbuhl contends he did no such thing and does not know what a bladed fighting stance is. *Id.* at 222.
[7] A videotape of the incident outside the Clinic was shown to the Court as Exhibit 6. Pictures of the Clinic are Exhibits 1 through 5. Dkt. No. 30.

8

Case 1:21-cr-00127-JRS    Filed 11/22/21    Page 8 of 10    Document 32

engaging verbally with officers throughout the encounter. *Id.* at 111. Although he did not hear any of what was said, he characterized what he saw as the encounter as one of aggressive body language. *Id.* at 112–14. In fact, Lawson testified the body language was so aggressive that he considered intervening in the situation before it got out of hand, he testified he was a former police officer of 17 years. *Id.* at 112–15. He did not intervene but presented himself to the officers after Krahenbuhl left the scene to tell them what he observed. *Id.* at 116.

Krahenbuhl's contentions are fatally damaged by the testimony of Lawson, who explicitly contradicts Krahenbuhl's assertion that he did not know officers were speaking with him until Turk grabbed his arm. Lawson's statements indicate Krahenbuhl was engaged the entire time and he described what he saw was a very agitated confrontation, that he had "concern" for the officers. As a neutral, dispassionate observer, his credible testimony is given great weight by the Court.

Krahenbuhl's account as to parking lot portion of the encounter is diminished in credibility. That leaves Turk and St. Amour to relay what was said. It is clear from their testimony, that of Lawson, and the video evidence that multiple instances of loud and abusive profane language occurred at the VA facility, of at least five times, as Krahenbuhl was leaving the Clinic, thereby satisfying the first two elements. As to the third element, it is clear from the testimony of Lawson and the officers that Krahenbuhl knew what he was doing. Krahenbuhl did, after all, obey instructions from the officers to abandon his fighting stance and he testified he had his reasons for his conduct that day.

Based on the evidence, the Court finds beyond a reasonable doubt that Krahenbuhl used loud and abusive and otherwise improper language against Turk and St. Amour. He did so on VA property and he did so knowingly.

In conclusion, having considered the evidence and arguments presented by the parties, the Court hereby finds Jamison L. Krahenbuhl guilty of disorderly conduct in violation of 38 C.F.R. §§ 1.218(a)(5) and (b)(11) as alleged in Count One and Count Two in the Second Amended Information.

**IT IS ORDERED** the United States Probation Office (USPO) shall prepare a modified pre-sentence report.

**IT IS FURTHER ORDERED** that the parties shall file a sentencing memoranda ten days from the date the modified USPO report is filed. The clerk is directed to set this matter on the Court's calendar for sentencing at least 45 days from the date of this Order. The Court will consider any request that the sentencing take place via Zoom.

**SO ORDERED** at Green Bay, Wisconsin this 22nd day of November, 2021.

s/ James R. Sickel
James R. Sickel
United States Magistrate Judge