UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES Of AMERICA,

        Plaintiff,

  v.                                  Case No. 1:21-CR-0127

JAMISON L. KRAHENBUHL,

        Defendant.

## DECISION AND ORDER AFFIRMING CONVICTION

      Jamison L. Krahenbuhl appeals from his conviction for two counts of disorderly conduct on property under the charge and control of the Veterans Administration, in violation of 38 C.F.R. §§ 1.218(a)(5) and (b)(11), following a bench trial before a magistrate judge. Judgment was entered on January 19, 2022, and a notice of appeal was timely filed. On appeal, Krahenbuhl contends that his conviction should be overturned because the magistrate judge erred "in failing to dismiss the case as violative of the freedom of speech guarantee when there was no imminent threat of violence." Br. of Defendant-Appellant, Dkt. No. 49 at 8. Krahenbuhl further contends that the magistrate judge erred in (1) granting the Government's second motion to amend the information; and (2) failing to dismiss the case when the Government failed to prove ownership of the property by the Department of Veterans Affairs. Finally, Krahenbuhl contends that he is entitled to dismissal because the Government failed to prove what agency owned and controlled the property. *Id.* I have jurisdiction under Fed. R. Crim. P. 58(g)(2)(B). For the reasons that follow, Krahenbuhl's conviction will be affirmed.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

The Secretary for Veterans Affairs is authorized to prescribe regulations that provide for the maintenance of law and order and the protection of persons and property on Department property. 38 U.S.C. § 901(a)(1). "Department property" is defined as "land and buildings that are under the jurisdiction of the Department and are not under control of the Administrator of General Services." § 901(a)(2). Pursuant to this authority, the Secretary has prescribed regulations that "apply at all property under the charge and control of VA (and not under the charge and control of the General Services Administration) and to all persons entering in or on such property." 38 C.F.R. § 1.218(a). Among the regulations prescribed by the Secretary is the following:

> 5) Disturbances. Conduct on property which creates loud or unusual noise; which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; which otherwise impedes or disrupts the performance of official duties by Government employees; which prevents one from obtaining medical or other services provided on the property in a timely manner; or the use of loud, abusive, or otherwise improper language; or unwarranted loitering, sleeping, or assembly is prohibited. In addition to measures designed to secure voluntary terminations of violations of this paragraph the head of the facility or designee may cause the issuance of orders for persons who are creating a disturbance to depart the property. Failure to leave the premises when so ordered constitutes a further disturbance within the meaning of this rule, and the offender is subject to arrest and removal from the premises.

38 C.F.R. § 1.218(a)(5). The regulations further provide:

> (b) Schedule of offenses and penalties. Conduct in violation of the rules and regulations set forth in paragraph (a) of this section subjects an offender to arrest and removal from the premises. Whomever shall be found guilty of violating these rules and regulations while on any property under the charge and control of VA is subject to a fine as stated in the schedule set forth herein or, if appropriate, the payment of fixed sum in lieu of appearance (forfeiture of collateral) as may be provided for in rules of the United States District Court. Violations included in the schedule of offenses and penalties may also subject an offender to a term of imprisonment of not more than six months, as may be determined appropriate by a magistrate or judge of the United States District Court:

****

> 11) Disorderly conduct which creates loud, boisterous, and unusual noise, or which obstructs the normal use of entrances, exits, foyers, offices, corridors, elevators, and stairways or which tends to impede or prevent the normal operation of a service or operation of the facility, $250.

38 C.F.R. § 1.218(b)(11).

### B. Pretrial Proceedings

Krahenbuhl was charged by information with two counts of violating 38 C.F.R. §§ 1.218(a)(5) and (b)(11) on June 17, 2021. Count One concerned Krahenbuhl's encounter with two VA police officers, Lieutenant Andrew Turk and Officer Daniel Amour. Count one reads:

> On or about March 29, 2021, at the Green Bay VA Healthcare Center in the State and Eastern District of Wisconsin, JAMISON L. KRAHENBUHL intentionally engaged in conduct which created a loud or unusual noise, and used loud, abusive, and otherwise improper language.

Dkt. No. 1. Count Two concerned Krahenbuhl's earlier encounter the same day with Respiratory Therapist Tiffany Mueller in the pulmonary section of the Clinic and its impact upon her and Respiratory Therapist Julie Malchak. It reads:

> On or about March 29, 2021, at the Green Bay VA Healthcare Center, PF Room, in the State and Eastern District of Wisconsin, JAMISON L. KRAHENBUHL intentionally engaged in conduct which impeded and disrupted the performance of official duties by Government Employees, specifically T.M. and J.M, and used loud, abusive and otherwise improper language.

*Id.* Krahenbuhl entered not guilty pleas to both counts and the case was set for trial.

On July 23, 2021, Krahenbuhl moved to dismiss the charges on the ground that 38 C.F.R. § 1.218(a)(5) and (b)(11), both facially and as applied, violated the First Amendment to the United States Constitution. Dkt. Nos. 4, 5 at 3–9. For his facial challenge, Krahenbuhl argued that the regulation was unconstitutionally overbroad and vague. Dkt. No. 5 at 4–5, 8–9. In his as applied challenge, Krahenbuhl argued that his speech/conduct that formed the basis of the charges against

3

him was protected by the First Amendment. *Id.* at 5–8. The magistrate judge denied the motion in a decision issued on October 11, 2021. Dkt. No. 11.

On October 13, 2021, the Government moved to amend the information to correct the date of the alleged offenses to March 24, 2021, in order to correct an error the magistrate judge had noted in his decision denying Krahenbuhl's motion to dismiss. Dkt. Nos. 11 at 1 n.1; 13. That motion was granted on the same day. On October 20, 2021, the Government filed a second motion for leave to file a second amended information to change the *mens rea* alleged from "intentionally" to "knowingly." Finding that the amendment represented a correct statement of the law and no prejudice to the defense, the magistrate judge granted the Government's motion, Dkt. No. 25, and the case proceeded to trial.

### C. Trial

The evidence presented at trial showed that on March 24, 2021, Jamison Krahenbuhl proceeded to the Milo C. Huemphner VA Outpatient Clinic in Green Bay, Wisconsin for an appointment with Tiffany Mueller, a respiratory therapist. Krahenbuhl, who served as a flight nurse for the Air Force, was medically retired in September 2020. Upon arrival at the Clinic, Krahenbuhl completed the required screening and security procedures and was escorted to the pulmonary area on the second floor for his appointment.

Krahenbuhl had previously been diagnosed with sleep apnea while stationed in Germany and had been provided continuous positive airway pressure (CPAP) equipment to address his condition. Respiratory Therapist Mueller, who also ran the CPAP Clinic at the Green Bay VA, noticed that the CPAP equipment Krahenbuhl had brought with him showed no use, and he admitted he had not been using it. Mueller then reviewed Krahenbuhl's sleep study and advised him that it was normal and did not show he had sleep apnea. Mueller explained that under VA

4

Case 1:21-cr-00127-WCG   Filed 12/08/22   Page 4 of 18   Document 51

guidelines he did not qualify to receive sleep apnea treatment or supplies, but that she could have him consult with a doctor.

At that point, according to Mueller, Krahenbuhl became upset, raised his voice and asked her who "the fuck" she was and what right she had to make such a determination. He also loudly slammed his fist on the table. Mueller immediately told Krahenbuhl that the appointment was over and that he should leave. Julie Malchak, another respiratory therapist, heard Krahenbuhl's yelling and his pounding on the table from the next office and feared for Mueller's safety. Malchak got up from her computer, went across the hall and activated the silent panic alarm to alert the VA police. In the meantime, Krahenbuhl continued yelling as Mueller proceeded to leave her office. Krahenbuhl followed her as she walked him to the door of her department.

Two uniformed VA police officers were alerted by the panic alarm and attempted to locate the source of the disturbance. Officer Daniel St. Amour checked the ground floor, while Lieutenant Andrew Turk went to the second floor via the stairs. Officer St. Amour encountered Krahenbuhl on the first floor near the Patient Advocate Office and the main entrance to the Clinic. St. Amour said Krahenbuhl was walking "very intently" with a "thousand-yard stare." After letting dispatch know he had located Krahenbuhl, St. Amour asked Krahenbuhl if they could talk, to which Krahenbuhl replied, "fuck off." Upon learning that there was no one at the Patient Advocate Office he could speak with, Krahenbuhl proceeded to leave the Clinic. When St. Amour asked to speak with him again, Krahenbuhl told him to "fuck off" several more times in a loud voice and headed out the door. St. Amour followed Krahenbuhl out the door, placed his hand on his shoulder and told him to stop. Krahenbuhl turned around and again told St. Amour to "fuck off."

By that time, Lieutenant Turk had arrived and joined Officer St. Amour in attempting to speak with Krahenbuhl. Krahenbuhl again told them to "fuck off" and said that "they were just security guards." As the three proceeded into the patient parking area, the officers attempted to get in front of Krahenbuhl and Lieutenant Turk grabbed his arm. Krahenbuhl assumed a fighting stance with a closed fist. St. Amour drew his pepper spray and pointed it at Krahenbuhl but lowered it when Krahenbuhl relaxed his stance. The officers told Krahenbuhl that they were also veterans and he had no right to speak to them in such a fashion. Krahenbuhl said that the people at the VA were "fucking" with his disability rating and they had no right to do so. Krahenbuhl then proceeded to his car, and Lieutenant Turk made the decision to let him go rather than further escalate the situation. Krahenbuhl started his car and sped out of the parking lot.

In his own testimony, Krahenbuhl admitted to raising his voice during his meeting with Mueller and slamming his hands on the table but claimed "it wasn't really that bad." As for his interactions with Officer St. Amour and Lieutenant Turk, Krahenbuhl testified that he did not push past the officers or tell them repeatedly to "fuck off." He claims he did not know why the officers wanted to talk to him. At the same time, however, Krahenbuhl testified he was "very angry" with Mueller because she told him he did not have sleep apnea. And his version of his encounter with Lieutenant Turk and Officer St. Amour was undermined by the testimony of Glenn Lawson, a former police officer and bystander to the stand-off in the parking lot. Although from his transport van he could not hear what was said, Lawson testified that Krahenbuhl was engaging verbally with the officers throughout the encounter and exhibited an aggressive posture toward them. Given Krahenbuhl's agitated state, Lawson testified that he became concerned for the officer's safety and considered exiting his vehicle and offering assistance.

Based on this evidence, the magistrate judge found that Krahenbuhl was guilty of both counts. Magistrate Judge's Findings of Fact, Conclusions of Law and Decision, Dkt. No. 32 at 10. As to the interaction with Respiratory Therapist Mueller (Count Two of the Information), the magistrate judge found that Krahenbuhl knowingly engaged in conduct at the Huemphner VA Clinic that was loud and unusual. The magistrate judge further found that Krahenbuhl's conduct impeded and disrupted the performance of official duties of Government employees. *Id.* at 5–6. As to his interaction with Lieutenant Turk and Officer St. Amour (Count One), the magistrate judge found that "Krahenbuhl used loud and abusive and otherwise improper language against Turk and St. Amour," and further, that he did so knowingly and on VA property. *Id.* at 10.

## II. ANALYSIS

### A. Standard of Review

Krahenbuhl's appeal is governed by Fed. R. Crim. P. 58(g)(2)(B). The scope of an appeal from a magistrate judge's judgment is "the same as in an appeal to the court of appeals from a judgment entered by a district judge." Rule 58(g)(2)(D). This means that the magistrate judge's legal conclusions will be reviewed de novo and factual findings will be reviewed for clear error. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (6th Cir. 2020). Under the clear error standard, the reviewing court will not overturn the factual findings unless there is a definite and firm conviction that a mistake has been made. *United States v. Corral*, 324 F.3d 866, 870 (7th Cir. 2003); *United States v. Swanquist*, 161 F.3d 1064, 1077 (7th Cir. 1998) ("Where there are two permissive views of the evidence, the fact finder's choice between them cannot be clearly erroneous.") Decisions that are entrusted to the trial court's discretion, such as the decision to allow amendment of an information, stand unless the discretion afforded is abused.

7

### B. Constitutional Challenge

During the pretrial proceedings before the magistrate judge, Krahenbuhl moved for dismissal of the information on the grounds that the sections of regulation he was alleged to have violated, 38 C.F.R. § 1.218(a)(5) and (b)(11), were unconstitutional both facially and as applied. He argued that the regulation was facially invalid because it was unconstitutionally vague and overbroad. It was also unconstitutional as applied to his case, Krahenbuhl argued, because it was being used to punish him for constitutionally protected speech. In his appeal, Krahenbuhl appears to have abandoned his argument that the regulation is facially unconstitutional. He argues only that the magistrate judge erred in concluding that his speech was not constitutionally protected. Dkt. No. 49 at 6–11. It is that argument that I address below.

The First Amendment protection of speech is not unlimited. *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). Even constitutionally protected speech is subject to reasonable time, place and manner restrictions. In *Grayned v. City of Rockford*, for example, the Court upheld an anti-noise ordinance that prohibited any person, "while on public or private grounds adjacent to any building in which a school or any class thereof is in session, [from] willfully mak[ing] or assist[ing] in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof . . . .'" 408 U.S. 104, 107–08 (1972). Rejecting the petitioner's overbreadth challenge, the Court explained:

> The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable. Although a silent vigil may not unduly interfere with a public library, . . . making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.

*Id.* at 416.

More recent cases have emphasized the distinction between a public forum and a non-public forum in assessing the authority of public authorities to impose restrictions on speech. As the Court explained in *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, in order to assess a First Amendment claim, a court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." 473 U.S. 788, 797 (1985). Public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate, such as public streets and parks. *Id.* at 802. Because a principal purpose of traditional public fora is the free exchange of ideas, restrictions on speech are permissible in a public forum "only when the [restriction] is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* at 800 (citing *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983)).

But the same is not true of non-public fora, i.e., places not traditionally open to assembly and debate. In a non-public forum, limitations on speech are justified so long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Ed. Ass'n*, 460 at 46). In a non-public forum, the court must look to the nature and use of the property and its compatibility with the expressive activity at issue in order to determine the proper scope of government control. *Id.* at 802–03. Moreover, the mere fact that the property is owned by the government does not make it a public forum. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Id.* at 799–800; *see also United States Postal Service v. Council of Greenburgh Civic Assns.*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.")

9

VA medical facilities, such as the Clinic, are non-public fora. *United States v. Szabo*, 760 F.3d 997, 1002 (9th Cir. 2014) (citing *Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008)). As the Ninth Circuit recognized in *Szabo*, "patients at VA medical facilities have significant health care needs, which justify the government's prohibiting conduct that diverts attention and resources from patient care." *Id.* (internal quotations omitted). It thus follows that "restrictions on speech in VA medical facilities do not violate the First Amendment so long as they are (1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral." *Id.*

As noted above, Krahenbuhl has abandoned, and thus waived, his argument that the regulations are facially unconstitutional. His argument on appeal is that the speech that forms the basis of the charges against him is constitutionally protected and, therefore, his conviction is invalid. Br. of Appellant-Defendant, Dkt. No. 49, at 6–11. Krahenbuhl contends that the magistrate judge erred in concluding that the expletives he uttered at Respiratory Therapist Mueller and the VA police officers were "fighting words" within the meaning of *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942), and thus not constitutionally protected. *Id.* (citing Decision and Order Denying Mot. to Dismiss, Dkt. No. 11 at 5–6.) Citing *Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978), and *Gower v. Vercler*, 377 F.3d 661 (7th Cir. 2004), Krahenbuhl contends that the rule denying constitutional protection to "fighting words" is limited to words that tend to incite an immediate breach of the peace. Because the expletives he uttered were not combined with personal threats against the individuals to whom they were uttered, Krahenbuhl contends his speech remained within the protection of the First Amendment.

Krahenbuhl also relies upon *Cohen v. California*, in which the Court overturned the disorderly conduct conviction of a defendant who walked through a county courthouse corridor wearing a jacket bearing the words "Fuck the Draft. 403 U.S. 15, 16 (1971). In *Cohen*, the defendant testified that he intended the words on his jacket to convey to the public the depth of his

10

Case 1:21-cr-00127-WCG   Filed 12/08/22   Page 10 of 18   Document 51

feelings against the Vietnam War and the draft. There was no evidence that he engaged in, or threatened to engage in, any act of violence. Nor did anyone else commit or threaten to commit any act of violence as the result of his conduct. The defendant did not make any loud or unusual noise, nor was there any evidence that he uttered any sound prior to his arrest. *Id.* at 16–17. In ruling that the conviction could not stand, the Court held that "absent a more particularized and compelling reason for its actions, the State may not, consistent with the First and Fourteenth Amendments, make the simple public display here involved in this single four-letter expletive a criminal offense." *Id.* at 26. Reflecting the growing popularity of moral relativism, even among the elite of the legal profession, Justice Harlan added the quip: "one man's vulgarity is another's lyric." *Id.* at 26. Krahenbuhl seems to view *Cohen* as a license for the conduct he directed toward the Respiratory Therapists and VA police officers he encountered at the Clinic on March 24, 2021.

*Cohen* provides no such license; nor do *Collin* or *Gower*. Those cases, at most, support Krahenbuhl's contention that his speech was constitutionally protected. But even constitutionally protected speech is subject to reasonable limitations in a non-public forum. *See Cornelius*, 473 U.S. at 799 ("Even protected speech is not equally permissible in all places and at all times.") Recall that in a non-public forum, such as the Clinic, limitations on speech are justified so long as the restrictions are reasonable in light of the purpose served by the Clinic and are viewpoint neutral, i.e., "not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 800. On its face, 38 C.F.R. § 1.218(a)(5) is a viewpoint neutral regulation. *Szabo*, 760 F.3d at 1003. "Accordingly, the only pertinent question is whether its application to [Krahenbuhl's] conduct is 'reasonable in light of the purpose served by the [Clinic].'" *Id.* (quoting *Peake*, 552 F.3d at 765).

The conduct for which Krahenbuhl was convicted included two episodes, as found by the magistrate judge. The first in time, but Count Two of the Information, consisted of Krahenbuhl

11

slamming his fist on the table and screaming at Respiratory Therapist Mueller the question, "who the fuck are you?" Dkt. No. 32 at 4. The magistrate judge noted that Mueller, whom he clearly found more credible than Krahenbuhl, testified that Krahenbuhl continued to "yell" at her to such an extent that she told him his appointment was over. *Id.* at 5. Respiratory Therapist Malchak, who was seated in the next office, heard the yelling and loud slamming noise and, fearing for Mueller's safety, went across the hall to activate the silent panic alarm to alert the VA police. *Id.* The magistrate judge reasonably found that Krahenbuhl violated the regulation by knowingly creating a loud and unusual noise and that it impeded and disrupted the performance of official duties of Government employees, i.e., the work of Mueller and Malchak. *Id.* at 5–6.

The conduct underlying the magistrate judge's finding as to Count One consisted of Krahenbuhl's interaction with the two VA police officers who responded to the panic alarm. The magistrate judge found that, even before he was out of the building, Krahenbuhl repeatedly told Officer St. Amour to "fuck off" in a loud voice as Officer St. Amour tried to question him concerning his behavior. *Id.* at 7. Krahenbuhl continued his behavior as Lieutenant Turk joined Officer St. Amour in the parking lot in their effort to investigate the disturbance. Rather than calm down and cooperate with the officers' efforts to investigate, which likely would have ended with a warning, Krahenbuhl continued telling them to "fuck off" and when stopped, adopted an aggressive fighting stance that he only relaxed when Officer St. Amour drew his pepper spray and pointed it at him. *Id.* at 7–8. Had Lieutenant Turk not exercised restraint in not pursuing the matter further, the disruption might well have become even worse. The magistrate judge found based on the testimony and video evidence that Krahenbuhl had knowingly used loud and abusive profane language at least five times while leaving the Clinic in clear violation of §§ 1.218(a)(5) and (b)(11). *Id.* at 9–10.

Application of the regulation to prohibit such conduct is reasonable in light of the purposes served by the Clinic. The regulation under which Krahenbuhl was prosecuted prohibits disturbances. Citing *Szabo*, the Government notes that attempting to limit disturbances VA medical facilities is reasonable because "(1) the purpose of VA facilities is to serve and care for veterans, (2) many veterans have heightened sensitivities, and (3) disturbances, including loud noises, can trigger psychological reactions from the VA patient population." *Id.* As *Szabo* and other courts have observed, "[t]he government's interest in caring for veteran patients and not triggering adverse psychological reactions from such patients is plainly a legitimate government interest." *Id.*; *see also United States v. Fentress*, 241 F. Supp. 2d 526, 531 (D. Md. 2003), *aff'd*, 69 Fed. App'x. 643 (4th Cir. 2003) ("The VA's legitimate interest in making a hospital a place of rest and healing will render a prohibition on 'loud, boisterous, and unusual noise' which impedes the operation of the hospital reasonable in the vast majority of situations."); *United States v. Rone*, 61 Fed. App'x. 535, 537, (10th Cir. 2003) ("The regulation reflects a reasonable policy judgment that "loud, abusive, or otherwise improper language" is so likely to be disruptive on VA premises that the mere fact of its use should be a misdemeanor violation.")

While the rest of society may be required to tolerate such behavior in public fora, such as our streets and parks, *see Snyder v. Phelps*, 562 U.S. 443 (2011), the need to maintain peace and order in a non-public forum, such as a VA medical facility outweighs the interest of individuals, such as Krahenbuhl, in venting their anger in loud, profane and abusive language. Application of 38 C.F.R. §§ 1.218(a)(5) and (b)(11) to such conduct does not violate Krahenbuhl's First Amendment rights. The magistrate judge did not err in denying Krahenbuhl's motion to dismiss.

### C. Motion to Amend Information

Krahenbuhl next challenges the magistrate judge's order granting the Government's Second Motion to Amend the Information. Both the original and First Amended Information

alleged that Krahenbuhl "intentionally" engaged in conduct that violated the cited regulations, suggesting that specific intent was required. Dkt. Nos. 1, 15. In its Second Motion to Amend the Information, the Government argued that the *mens rea*, or mental state, required for the crime of disorderly conduct was that the defendant act knowingly. Dkt. No. 18. Agreeing with the Government's analysis of the law and finding no prejudice to the defense in allowing the amendment, the magistrate judge granted the Government's motion. Dkt. No. 25. Krahenbuhl argues that the magistrate judge erred in concluding that the crime he was charged with was not a specific intent crime and that the change would not result in prejudice to the defense.

"In order to convict a defendant of a general intent crime, the government must prove only that the defendant 'consciously and voluntarily [engaged] in the proscribed conduct.'" *United States v. Durham*, 645 F.3d 883, 891 n.1 (7th Cir. 2011) (quoting *United States v. Bates*, 96 F.3d 964, 967 (7th Cir. 1996)). "Specific intent crimes require additional proof of the defendant's 'intent to effectuate a particular result.'" *Id.* Whether the crime of disorderly conduct is a specific intent crime is a question of law that this court reviews *de novo*. *Bates*, 96 F.3d at 967. "[D]etermining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.'" *Staples v. United States*, 511 U.S. 600, 605 (1994) (quoting *United States v. Balint*, 258 U.S. 250, 253 (1922)). Where, as here, the language of a criminal statute is silent as to the *mens rea* required for a violation, the statute is generally read to require only that a defendant know the facts that make his conduct illegal, which is the same as general intent. *Id.* at 605; *United States v. Jackson*, 248 F.3d 1028, 1030 (10th Cir. 2001).

Those courts that have addressed the issue have concluded that the crime described by § 1.218(a)(5) is a general intent crime. *Szabo*, 760 F.3d at 1001 n. 2; *United States v. DeGarza*, 468 F. Supp. 3d 794, 798 (W.D. Texas 2020) (holding "the government must also prove that

14

DeGarza engaged in this conduct knowingly"); *United States v. Thomas*, No. 13-337OM–001-PHX-LOA, 2013 WL 5783408, at *3 (D. Ariz., Oct. 28, 2013) ("As a general intent crime, '[t]he government need prove no more than that the defendant acted knowingly when he used loud and abusive language or engaged in conduct that obstructed the use of the entrance.'") (quoting *United States v. Dyers*, No. 1:06-MJ-455-AJB, 2007 WL 397109, *9 (N.D. Ga. Jan. 30, 2007)); *United States v. Jackson*, No. 2:21-cr-00056-TLN, 2021 WL 5417738, *2 (E.D. Cal. Nov. 19, 2021) ("The parties agree that violations of 38 C.F.R. § 1.218 are general intent crimes.") Krahenbuhl contends that several courts have held that §§ 1.218(a)(5) and (b)(11), read in conjunction, require a "specific intent to 'disturb the normal operation of a VA facility, Dkt. No. 49 at 18. In truth, none of the cases cited by him so hold. In *United States v. Agront*, 773 F.3d 192, 198 (9th Cir. 2014), the court held that the conduct must be "serious enough to disturb the normal operation of a VA facility," not that the defendant must have such an intent. The mental state required for a conviction was not even discussed. The same is true of the Sixth Circuit's unpublished decision in *United States v. Williams*, No. 89-3720, 1990 WL 811 (6th Cir. Jan. 8, 1990). And in *United States v. Renfro*, 702 Fed. App'x. 799 (11th Cir. 2017), a case also cited by Krahenbuhl, the court likewise did not hold that §§ 1.218(a)(5) and (b)(11) create a specifical intent crime. To the contrary, the court expressly applied the general intent standard and found that the evidence in that case was sufficient to prove the defendant "acted knowingly." *Id.* at 808. Because the regulations do not state otherwise, and in light of the authority described above, the magistrate judge did not err in holding that the crime described in §§ 1.218(a)(5) and (b)(11) was a general intent crime.

Nor did the magistrate judge abuse his discretion in granting the Government's motion to amend the Information. The rule governing amendment of an information provides: "Unless an additional or different offense is charged or a substantial right of the defendant is prejudiced, the court may permit an information to be amended at any time before the verdict or finding." Fed.

R. Crim. P. 7(e). Krahenbuhl argues that the magistrate judge erred in failing to find that allowing such an amendment only two weeks before trial caused him to suffer prejudice. He also contends that allowing the amendment violated his Fifth Amendment.

The magistrate judge properly found that Krahenbuhl suffered no prejudice as a result of the amendment to the information. The amendment did not change the charges against him; it simply corrected the *mens rea* that was legally required for the crimes alleged. As the Government points out, Krahenbuhl's defense was never that he lacked the required state of mind. His principal argument from the outset was that his conduct was constitutionally protected and thus the prosecution was invalid. As the magistrate judge noted in granting the Government's motion, "the proposed change did not alter what witnesses would need to be called or what facts would need to be developed." Dkt. No.25 at 3. Although Krahenbuhl argued "vociferously" that he would be prejudiced by the proposed change, he offered nothing more. *Id.* No request was made for an adjournment which presumably could have cured any prejudice if any had been shown. Based on this record, the magistrate judge's decision was a sound exercise of discretion and well grounded in the law.

Krahenbuhl's argument that allowing the amendment violated his rights under the Fifth Amendment is a non-starter. The Fifth Amendment right to prosecution by indictment issued by a Grand Jury applies only to felonies. Krahenbuhl was charged by information with misdemeanors, and thus the Fifth Amendment does not apply except insofar as his right to due process would be implicated. And absent any showing of prejudice, no due process violation can be shown.

### D. Ownership or Control of VA Clinic

Lastly, Krahenbuhl argues that the Government failed to prove that the Clinic was under the jurisdiction of the Department of Veteran Affairs and not under the control of the Administrator

16

of General Services.  This argument is based on the statute authorizing the Department of Veterans Affairs to prescribe rules governing the conduct of persons entering Department property.  38 U.S.C. § 901(a)(1).  The statute defines "Department property" as "land and buildings that are under the jurisdiction of the Department [of Veteran Affairs] and are not under the control of the Administrator of General Services."  § 901(a)(2).  The same limitation appears in the regulation promulgated by the Department to implement this authority.  It states: "Pursuant to 38 U.S.C. 901, the following rules and regulations apply at all property under the charge and control of VA (and not under the charge and control of the General Services Administration) and to all persons entering in or on such property."  38 C.F.R. § 1.218(a).  Krahenbuhl argues that because the Government did not call a witness to testify that the Clinic was under the control of the VA and not under the control of the General Services Administration, the charges should have been dismissed.

On a challenge to the sufficiency of the evidence, a defendant bears a heavy burden.  If after viewing the evidence and all inferences reasonably drawn from that evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must be upheld.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir. 1992), *cert. denied*, 507 U.S. 935 (1993); *United States v. Carter*, 695 F.3d 690, 698 (7th Cir. 2012).  Under this standard, Krahenbuhl's argument fails.

The evidence clearly established that the Clinic was under the control of the VA.  Officer St. Amour and Lieutenant Turk both testified that they were employed by the Department of Veterans Affairs and were stationed at the Clinic.  They worked out of an office at that location and were dispatched to respond to the panic alarm activated by Respiratory Therapist Malchak.  Their duties included patrolling and investigating, while dressed in VA police uniforms, offenses

17

occurring in the interior of the Clinic as well as in the parking lot. Furthermore, the record is bereft of any evidence that any representative of the General Services Administration was anywhere on the premises. Given this evidence, it was reasonable for the magistrate judge to infer that the Clinic was under the control of the VA and not under the control of GSA. The magistrate judge did not err in denying Krahenbuhl's motion for judgment of acquittal.

## ORDER

For the reasons set forth above, the judgment of conviction is affirmed.

Dated at Green Bay, Wisconsin this 7th day of December, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge